## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHULI CHIU and AMANDA KIM, Derivatively on Behalf of OVASCIENCE, INC., | Index No: |
| Plaintiffs, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| MICHELLE DIPP, RICHARD ALDRICH, JEFFREY D. CAPELLO, MARY FISHER, JOHN HOWE, III, MARC KOZIN, and JOHN SEXTON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| OVASCIENCE, INC., a Delaware corporation, | |
| Nominal Defendant. | |

Plaintiffs Shuli Chiu and Amanda Kim ("Plaintiffs"), by and through their undersigned counsel, derivatively on behalf of Nominal Defendant OvaScience, Inc. ("OvaScience" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by OvaScience with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of OvaScience against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties and unjust enrichment that occurred between January 8, 2015 and the present (the "Relevant Period") and have caused substantial harm to OvaScience.

2.      OvaScience is a fertility company that claims to have discovered a therapy which increases in vitro fertilization ("IVF") live birth rates by extracting mitochondria (a substance in egg cells which is generally viewed as the energy source of the egg) from egg precursor cells (immature egg cells found in the protective outer layer of a woman's own ovaries) and injecting the same into the mature egg being utilized in the IVF process.  This process, the AUGMENT$^{SM}$ treatment ("AUGMENT"), is the Company's sole marketable product.

3.      The theory that such injection of additional mitochondria improves egg health and IVF success rates, is difficult to test and prove.  It is further difficult to test the efficacy of the AUGMENT treatment.

4.      Nonetheless, and as detailed herein, the Company repeatedly communicated to investors that the efficacy of AUGMENT had been ***scientifically validated***, which was untrue. Further, on March 16, 2015, the Company represented to investors that it was on target to have 1,000 active AUGMENT treatment cycles in process by the end of fiscal 2015, which was untrue and known by the Company to be untrue.

5.      Throughout the Relevant Period, Defendants caused the Company to issue false and misleading statements and/or failed to disclose, among other things, that: (a) the science behind AUGMENT had not been scientifically validated; (b) the Company was unable to achieve

#

the purported success rates it claimed; (c) the reasons why the Company moved its studies outside of the United States; (d) that at all relevant times, the Company's profitability and prospects were false and misleading; and (e) resultantly, the Company lacked adequate internal controls over its publicly issued statements and financial reporting.

## JURSIDICTION AND VENUE

6.      Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

7.      Venue is proper in this Court under 28 U.S.C. § 1931(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and by doing business here and engaging in numerous activities that had an effect in this District.

## PARTIES

A.      **Plaintiffs**

8.      ***Plaintiff Shuli Chiu*** ("Plaintiff Chiu") is, and was at relevant times, a shareholder of OvaScience.  Plaintiff Chiu will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Chiu is a citizen of California.

9.      ***Plaintiff Amanda Kim*** ("Plaintiff Kim") is, and was at relevant times, a shareholder of OvaScience.  Plaintiff Kim will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff Kim is a citizen of Colorado.

B.      **Nominal Defendant**

10.     ***Nominal Defendant OvaScience, Inc.*** ("OvaScience") is a Delaware Corporation with its principal executive offices located at 9 Fourth Avenue, Waltham, Massachusetts.

#

OvaScience describes itself as a global fertility company developing proprietary potential treatments for female infertility based on scientific discoveries about the existence of egg precursor cells.

## C.    Director Defendants

11.    *Defendant Michelle Dipp, M.D., Ph.D.* ("Dipp") co-founded OvaScience in April 2011, and served as a member of the Board since July 2011.  Dipp served as Chief Executive Officer ("CEO") from June 2011 until July 2016, President from September 2011 until December 2014, and Executive Chair since January 2016.  Dipp is a citizen of Texas.

12.    *Defendant Richard Aldrich* ("Aldrich") co-founded OvaScience in a non-operational role in April 2011.  He has served as a member of the Board since July 2011 and served as the Chairman of the Board from March 2012 until January 2016.  Aldrich is the Chairperson of the Nominating and Corporate Governance Committee.  Aldrich is a citizen of Massachusetts.

13.    *Defendant Jeffrey D. Capello* ("Capello") has served as a member of the Board since March 2012.  Capello is a "Financial Expert" and is the Chairperson of the Company's Audit Committee.  Capello is a citizen of Massachusetts.

14.    *Defendant Mary Fisher* ("Fisher") has served as a member of the Board since June 2013.  Fisher is a member of the Company's Compensation Committee.  Fisher is a citizen of California.

15.    *Defendant Marc Kozin* ("Kozin") has served as a member of the Board since January 2014.  Kozin is a member of the Company's Nominating and Corporate Governance Committee and the Global Strategy Committee.  Defendant Kozin is also a member of the Audit Committee.  Kozin is a citizen of New Hampshire.

16.    *Defendant John Sexton, Ph.D.* ("Sexton") has served as a member of the Board

since April 2015.  Sexton is a member of the Company's Global Strategy Committee.  Sexton is a

citizen of New York.

17.     ***Defendant John Howe, III*** ("Howe") has served as a member of the Board since

June 2015.  Howe is the Chairman of Company's Compensation Committee.  He is also a member

of the Audit Committee and the Global Strategy Committee.  Howe is a citizen of Washington.

18.     Defendants Dipp, Aldrich, Capello, Fisher, Kozin, Sexton, and Howe are

hereinafter referred to as the "Defendants."

### THE COMPANY'S CODE OF BUSINESS CONDUCT
### CORPORATE GOVERNANCE GUIDELINES
### NOMINATING AND CORPORATE GOVERNANCE CHARTER
### GLOBAL STRATEGY COMMITTEE

19.     As members of the Company's Board, Defendants were held to the highest

standards of honesty and integrity and charged with overseeing the Company's business.

20.     The Company's Code of Business Conduct entitled "Code of Conduct and Ethics"

states in relevant part:

> This Code of Business Conduct and Ethics (the "Code") sets forth
> legal and ethical standards of conduct for employees, officers and
> directors of OvaScience, Inc. (the "Company"). This Code is
> intended to deter wrongdoing and to promote the conduct of all
> Company business in accordance with high standards of integrity
> and in compliance with all applicable laws and regulations.  Except
> as otherwise required by applicable local law, this Code applies to
> the Company and all of its subsidiaries and other business entities
> controlled by it worldwide.
>
> \*      \*      \*
>
> **Compliance with Laws, Rules, and Regulations**
>
> The Company requires that all employees, officers and directors
> comply with all laws, rules and regulations applicable to the
> Company wherever it does business.  You are expected to use good
> judgment and common sense in seeking to comply with all
> applicable laws, rules and regulations and to ask for advice when

#

you are uncertain about them.

*       *       *

**Honest and Ethical Conduct and Fair Dealing**

Employees, officers and directors should endeavor to deal honestly, ethically and fairly with the Company's suppliers, customers, competitors and employees.  Statements regarding the Company's products and services must not be untrue, misleading, deceptive or fraudulent.  You must not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

*       *       *

**Accuracy of Books and Records and Public Reports**

Employees, officers and directors must honestly and accurately report all business transactions.  You are responsible for the accuracy of your records and reports.  Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

All Company books, records and accounts shall be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record.  The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies.  No undisclosed or unrecorded account or fund shall be established for any purpose.  No false or misleading entries shall be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property shall be made without adequate supporting documentation.

It is the policy of the Company to provide full, fair, accurate, timely and understandable disclosure in reports and documents filed with, or submitted to, the Securities and Exchange Commission and in other public communications.

21.     The Company's Corporate Governance Guidelines states in relevant part:

**A.      Director Responsibilities**

#

1. <u>Oversee Management of the Company</u>.  The principal responsibility of the directors is to oversee the management of the Company and, in so doing, serve the best interests of the Company and its stockholders.  This responsibility includes:

    - Reviewing and approving fundamental operating, financial and other corporate plans, strategies and objectives.
    - Evaluating the performance of the Company and its senior executives and taking appropriate action, including removal, when warranted.
    - Evaluating the Company's compensation programs on a regular basis and determining the compensation of its senior executives.
    - Reviewing and approving senior executive succession plans.
    - Evaluating whether corporate resources are used only for appropriate business purposes.
    - Establishing a corporate environment that promotes timely and effective disclosure (including robust and appropriate controls, procedures and incentives), fiscal accountability, high ethical standards and compliance with all applicable laws and regulations.
    - Reviewing the Company's policies and practices with respect to risk assessment and risk management.
    - Reviewing and approving material transactions and commitments not entered into in the ordinary course of business.
    - Developing a corporate governance structure that allows and encourages the Board to fulfill its responsibilities.
    - Providing advice and assistance to the Company's senior executives.
    - Evaluating the overall effectiveness of the Board and its committees.

2. <u>Exercise Business Judgment</u>.  In discharging their fiduciary duties, directors are expected to exercise their business judgment to act in what they reasonably believe to be the best interests of the Company and its stockholders.

3. <u>Understand the Company and its Business</u>.  Directors have an obligation to become and remain informed about the Company and its business, including the following:

    - The principal operational and financial objectives, strategies and plans of the Company.

#

- The results of operations and financial condition of the Company and of significant subsidiaries and business segments.
- The relative standing of the business segments within the Company and as compared to competitors, if applicable.
- The factors that determine the Company's success.
- The risks and problems that affect the Company's business and prospects.

4. <u>Establish Effective Systems</u>. Directors are responsible for determining that effective systems are in place for the periodic and timely reporting to the Board on important matters concerning the Company, including the following:

- Current business and financial performance, the degree of achievement of approved objectives and the need to address forward-planning issues.
- Future business prospects and forecasts, including actions, facilities, personnel and financial resources required to achieve forecasted results.
- Financial statements, with appropriate segment or divisional breakdowns.
- Compliance programs to assure the Company's compliance with law and corporate policies.
- Material litigation and governmental and regulatory matters.
- Monitoring and, where appropriate, responding to communications from stockholders.

Directors should also periodically review the integrity of the Company's internal control and management information systems.

22.     The Company's Nominating and Corporate Governance Charter states in relevant

part:

### A.     Purpose

The purpose of the Nominating and Corporate Governance Committee of the Board of Directors (the "Board") of OvaScience, Inc. (the "Company") is to:

- recommend to the Board the persons to be nominated for election as directors at any meeting of stockholders and the

#

persons (if any) to be elected by the Board to fill any vacancies on the Board;
- recommend to the Board the directors to be appointed to each committee of the Board;
- develop and recommend to the Board corporate governance guidelines; and
- oversee the evaluation of the Board.

*      *      *

## C.      Authority and Responsibilities

### General

The Nominating and Corporate Governance Committee shall discharge its responsibilities, and shall assess the information provided to it by the Company's management and others, in accordance with its business judgment.

*      *      *

### Corporate Governance

5. <u>Corporate Governance Guidelines</u>. The Nominating and Corporate Governance Committee shall develop and recommend to the Board corporate governance guidelines applicable to the Company. The Committee shall, from time to time as it deems appropriate, review and reassess the adequacy of such corporate governance guidelines and recommend any proposed changes to the Board for approval.
6. <u>Board Leadership Structure</u>. As more fully provided for in the Company's Corporate Governance Guidelines, the Nominating and Corporate Governance Committee shall periodically review the Board's leadership structure to assess whether it is appropriate given the specific characteristics and circumstances of the Company.

### Evaluation of the Board; Succession Planning

7. <u>Evaluation of the Board</u>. The Nominating and Corporate Governance Committee shall be responsible for overseeing an annual self-evaluation of the Board to determine whether it and its committees are functioning effectively. The Committee shall determine the nature of the evaluation, supervise the conduct of

#

the evaluation and prepare an assessment of the Board's performance, to be discussed with the Board.

\*     \*     \*

23.     The Company's Definitive Proxy Statement, filed on Form DEF 14A with the Securities and Exchange Commission ("SEC") on April 26, 2017 (the "2017 Proxy"), generally describes the responsibilities of the Compensation Committee to include:

- annually reviewing and approving corporate goals and objectives relevant to our Chief Executive Officer's compensation;
- determining our Chief Executive Officer's compensation;
- reviewing and approving, or making recommendations to our board with respect to, the compensation of our other executive officers;
- overseeing an evaluation of our senior executives;
- overseeing and administering our equity incentive plans; and
- reviewing and making recommendations to our board with respect to director compensation.

24.     The 2017 Proxy states that in March 2017, the Company established a Global Strategy Committee to support the Board in providing Board level global strategic guidance to the Executive Chair and executive management team. The Company's website does not mention this committee or provide a charter. The 2017 Proxy states that the Global Strategy Committee's responsibilities include:

- advising the Executive Chair and executive management team generally on global strategy, as well as on the development and implementation of the Company's strategic plan; and
- advising the Executive Chair and executive management team on strategies for approaching international markets, including guidance on cultural, regulatory and government affairs matters.

## DUTIES OF DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The

#

obligations required Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

26.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

27.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate

#

system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

## Background

29.     OvaScience was founded in 2011 by Defendants Dipp and Aldrich and non-parties

#

Jonathan Tilly ("Tilly") and Christoph Westphal ("Westphal").  Dipp, Aldrich and Westphal are all partners at Longwood Fund, LP. Longwood Fund GP, LLC, an affiliate of Longwood Fund, LP, is an approximately 7% holder of OvaScience.

30.     OvaScience is a fertility company that claims it discovered a therapy which increases the "health" of female eggs using in vitro fertilization ("IVF") by extracting mitochondria (a substance in egg cells which is generally viewed as the energy source of the egg) from egg precursor cells and injecting them into mature eggs for better results in the IVF process.

31.     OvaScience did not discover the scientific fact that egg precursor cells exist.  The Company did not originate the idea of transferring mitochondria from one egg to another (IVF specialists used mitochondria from donor eggs). OvaScience's original idea was to utilize mitochondria from a patient's own precursor eggs during the IVF process.

32.     OvaScience's new idea – extracting mitochondria from egg precursor and injecting it into mature eggs – lacks scientific validation.  It is difficult to scientifically prove that OvaScience's therapy increases live birth rates; based on the nature of the therapy there can never be a control group.

33.     Additionally, the size of the AUGMENT study groups are so small as to be statistically meaningless.  The Company did not attempt to conduct scientifically meaningful trials of its product as evidenced by a statement of Defendant Dipp to Science Magazine: "The fertility [industry] just doesn't do trials."

34.     On September 10, 2013, the Company issued a press release to provide an update on AUGMENT, which stated that OvaScience suspended enrollment in AUGMENT in the U.S. while moving forward with its plans for enrollment outside of the U.S.  This decision came after it received an "untitled" letter from the U.S. Food and Drug Administration ("FDA") questioning

#

the status of AUGMENT and advising the Company to file and Investigational New Drug ("IND") application.  At that time, the Company stated "OvaScience anticipates having further discussions with the FDA to present details on AUGMENT and its qualifications . . . to determine the appropriate path forward."  Upon information and belief, Plaintiffs allege that instead of continuing to develop AUGMENT to meet FDA standards, the Company took its IVF studies outside of the U.S. and never engaged in further discussions with the FDA.

35.    On November 10, 2014, the Company filed a Form S-3 registration statement with the SEC for the registration of up to $150,000,000 of any combination of the Company's securities, including common stock, preferred stock, debt securities, warrants, rights, purchase contracts and units (the "Registration Statement").  The SEC declared the Registration Statement effective on November 21, 2014.

36.    On December 17, 2014, the Company issued a press release announcing "AUGMENT Treatment Available in Four International Regions."   The press release further stated in relevant part:

> The AUGMENT fertility treatment is available in select in vitro fertilization (IVF) clinics in Canada, the United Kingdom (UK), the United Arab Emirates (UAE) and Turkey.
>
> *      *      *
>
> OvaScience exceeded its AUGMENT patient treatment goal with more than 150 patients now receiving the treatment.  The Company has started transitioning some of the IVF clinics to commercial centers.

37.    In connection with the Registration Statement, on January 6, 2015, the Company filed a preliminary prospectus for the sale of its common stock and a final prospectus on January 8, 2015 (the "Prospectus," together with the Registration Statement, the "Offering Materials"), in which the Company offered 2,300,000 shares of its common stock at a public offering price of

#

$50.00 per share (the "Offering").

38.     In connection with the Offering, the Company sold an aggregate of 2,645,000 shares of common stock at $50.00 per share, which included 345,000 shares that represented the full exercise of an option to purchase additional shares granted to the underwriters of the Offering.

39.     The Offering resulted in $124.1 million on net proceeds, after deducting underwriting discounts and commissions and other offering expenses.

## MATERIAL MISSTATEMENTS
## AND OMISSIONS DURING THE RELEVANT PERIOD

40.     The Relevant Period begins on January 8, 2015, when the Company issued the Prospectus in connection with the Offering, which incorporated the Registration Statement.  The Offering Materials contained false and misleading statements and/or omitted material information concerning the true results for the women who participated in the AUGMENT fertility treatment, including that the Company's AUGMENT procedure did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure.

41.     In particular, the Offering Materials emphasized that the Company's AUGMENT treatment had been launched in select international clinics as early as 2014, and stated, in pertinent part:

> ### The AUGMENT treatment
>
>  In 2014, we launched the AUGMENT treatment in select international IVF clinics through AUGMENT Centers of Excellence, or ACE clinics, in Canada, the United Kingdom, Turkey and the United Arab Emirates.

42.     The Offering Materials were signed by Defendant Dipp and Jeffrey E. Young ("Young") (the Chief Financial Officer ("CFO")) of the Company from September 2014 until

#

September 6, 2016).

43.     On March 16, 2015, the Company filed its Annual Report on Form 10-K with the

SEC for the fiscal year ended December 31, 2014 (the "2014 10-K").  Under the section entitled

"Management's Discussion and Analysis of Financial Condition and Results of Operations," the

2014 10-K stated in pertinent part:

> The AUGMENT treatment is not available in the United States.
> This treatment is specifically designed to improve egg health by
> supplementing a mitochondrial deficiency which may in turn offer
> the potential for enhanced IVF.  With the AUGMENT treatment,
> energy-producing mitochondria from a patient's own EggPC cells
> are added to the patient's mature eggs during the IVF process to
> supplement the existing mitochondria. ***We expect 1,000
> AUGMENT treatment cycles will be in process by the end of 2015***.

44.     The 2014 10-K was signed by Defendant Dipp and non-party Young and contained

signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Dipp and

non-party Young.  The SOX certifications state the following:

> I have reviewed this Annual Report on Form 10-K of OvaScience,
> Inc.;
>
> Based on my knowledge, this report does not contain any untrue
> statement of a material fact or omit to state a material fact necessary
> to make the statements made, in light of the circumstances under
> which such statements were made, not misleading with respect to the
> period covered by this report;
>
> Based on my knowledge, the financial statements, and other
> financial information included in this report, fairly present in all
> material respects the financial condition, results of operations and
> cash flows of the registrant as of, and for, the periods presented in
> this report;
>
> The registrant's other certifying officer and I are responsible for
> establishing and maintaining disclosure controls and procedures (as
> defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and
> internal control over financial reporting (as defined in Exchange Act
> Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

#

(a) Designed such disclosure controls and procedures, or caused such   disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its          consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to material affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

45.      Also, on March 16, 2015, the Company issued a press release and corresponding

current report on Form 8-K with the SEC announcing its fourth quarter and year end 2014 financial

results.  In the press release, the Company stated, *"[i]n 2015, OvaScience plans to have 1,000 AUGMENT treatment cycles in process."*

46.     Throughout the Relevant Period, Defendants issued false and misleading statements and failed to disclose material adverse facts about the Company's business, operations and prospects. In particular, Defendants caused the Company to issue false and misleading statements and/or failed to disclose, among other things, that: (a) the science behind AUGMENT had not been scientifically validated; (b) the Company was unable to achieve the purported success rates it claimed; (c) the reasons why the Company moved its studies outside of the United States (due to failure to achieve FDA approval); and (d) that at all relevant times, the Company's profitability and prospects was false and misleading.

47.     As such, throughout the Relevant Period, Defendants failed to disclose that the approximately 150 patients that had received OvaScience's AUGMENT procedure in 2014 did not achieve a pregnancy success rate that was significantly higher than the rate achieved without the Company's AUGMENT procedure.  As a result of the false and misleading statements issued by defendants, the price of the Company's shares was artificially inflated throughout the Relevant Period.

### THE TRUTH EMERGES

48.     The market first began to learn the truth concerning the success rate of the Company's AUGMENT fertility treatment when Company disclosed the results in press releases on March 26, 2015 and March 28, 2015.

49.     On March 26, 2015, the Company issued a press release entitled "OvaScience AUGMENT Fertility Treatment Shows Improved Pregnancy Rates in Women with Prior Failed IVF Cycles."  The press release stated in pertinent part:

#

Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners of Toronto, Canada, a mitochondrial expert and one of the first IVF specialists to use the AUGMENT treatment in clinical practice, reported initial patient experiences in women whose ages ranged from 28 to 40 years and who had one to three previous failed IVF cycles, often with poor embryo quality. *In 26 women who received the AUGMENT treatment, there were 9 clinical pregnancies out of 17 embryo transfers (53%).*

The results reported in the poster presentation represent experiences from a small number of patients with different diagnoses, ages and prior IVF history. *As of this reporting, pregnancy rates across IVF clinics that offer the AUGMENT treatment currently range from 25% - 53%, which includes clinics that are treating some of the more challenging infertility patients.* OvaScience is collecting AUGMENT patient experience in a first-of-its-kind international registry, and anticipates sharing information from a broader patient experience when it is available.

50.     In the press release, Dr. Casper further stated:

*We are impressed with the pregnancy rate that we have seen with the AUGMENT treatment in women who tried IVF multiple times and never had a successful pregnancy . . . . We are encouraged by these results and believe the AUGMENT treatment may offer a much needed fertility treatment for women who are seeking new options.* We look forward to continuing to report our clinical experiences in a wide range of patients who may benefit from the AUGMENT treatment.

51.     On March 27, 2015, Gena Wang and Howard Liang, analysts for Leerink Partners LLC ("Leerink") who covered the Company, stated that AUGMENT's "[o]verall pregnancy rate appears less robust with a different denominator" and "the magnitude of AUGMENT benefit is unclear given no clear benchmarks and lack of standardized metrics."

52.     On March 28, 2015, the Company issued a press release entitled "Additional Clinical Reports of OvaScience AUGMENT Fertility Treatment Show Improved Pregnancy Rates in Women with Multiple Prior Failed IVF Cycles."  The press release stated in pertinent part:

Kutluk Oktay, M.D., F.A.C.O.G., of Gen-art IVF in Ankara, Turkey, and one of the initial IVF specialists to use the AUGMENT

treatment in clinical practice, presented initial clinical experience in eight women whose ages ranged between 27 and 41 years with three or more IVF failures and poor egg and embryo quality. In eight women who received the AUGMENT treatment, *there were two clinical pregnancies out of eight embryo transfers (25%).* Most notably, the two pregnancies occurred with single embryo transfers in women aged 34 and 41 who had previously failed to become pregnant following seven and three IVF cycles, respectively.  One patient has an ongoing clinical pregnancy.

53.     On March 30, 2015, Andrew S. Fein, an analyst for H.C. Wainwright & Co., questioned the Company's AUGMENT data pregnancy rate calculation stating that "the data raised interesting questions regarding . . . the use of embryo transfer as the denominator in calculating success rates . . . ."  Fein further explained that an alternative representation of the data would result in a 35% success rather than the 53% success rate declared, and this method is utilized by The Society for Reproductive Technology ("SART").   Mr. Fein further stated:

> Success rates for AUGMENT were presented as a fraction of the total number of embryo transfers, reporting a 53% pregnancy rate (9 pregnancies of 17 embryo transfers) for the Canadian site and 25% (2 pregnancies of 8 embryo transfers) at the site in Turkey. *However, we note that an alternative representation of the data would have included all IVF cycles as the denominator (9 pregnancies form 26 cycles; 35% success rate).*  Due to the nature of the technology (requiring additional manipulation of the oocyte at time of ICSI), the denominator could have reflected those patients that failed fertilization and failed to produce viable blastocysts. *This method is not without precedent: we note that The Society for Reproductive Technology (SART), which represents the majority of IVF clinics in the US, reports IVF pregnancy rates as a percentage of IVF cycles,* which are further delineated by fresh and frozen transfers.

54.     After the truth began to emerge concerning the AUGMENT treatment results, the Company's shares plummeted $17.14 from $48.29 on March 26, 2015 to $31.15 on April 1, 2015, a loss of approximately 35% on unusually heavy volume of approximately 1.9 million shares.

55.      On April 2, 2015, Oppenheimer analyst Rohit Vanjani opined that "[s]hares of

#

OvaScience have traded down over 40% over the last week" because investors were stuck on one metric, AUGMENT's reported pregnancy rate.  Mr. Vanjani also added that "[m]uch has been made about the correct denominator to use in calculating the AUGMENT pregnancy rate . . ." and "[w]e certainly understand why investors have put the pregnancy rate metric in focus.  Investors are still trying to understand if the AUGMENT technology works and if it will get adopted, and that metric is undoubtedly important."

56.     On April 6, 2015, SIRF published an article entitled "Irreproducible Results, Inc." which challenged the reported 53% clinical pregnancy rate observed from the Canadian physician's data and countered that ***"26 women got the treatment (AUGMENT) and, of them, 7 were able to successfully maintain a pregnancy for just under a 27 percent success rate."***

57.     In addition, the SIRF article suggests that the AUGMENT procedure data presented did not achieve a significant success rate of clinical pregnancies compared to previous rates achieved without the Company's AUGMENT procedure (rates provided by the CDC).  The article stated the following:

> . . . the Centers for Disease Control's archive of assisted reproductive technology statistics suggests at least a broad idea of what the press release's reported effects mean.
>
> The median age of the women receiving OvaScience's treatment in the Toronto clinic was 33 years old, with an average of two previous IVF treatment cycle failures.
>
> ***According to the CDC in 2012 – the most recent year available for data – of the women studied who were 35 and under who failed two prior IVF treatment cycles and received IVF with fresh non-donor eggs or embryos, 33 percent were expected to deliver a live birth.***

58.     Other analyst reports opined that the SIRF article was partly responsible for investor doubt that led to material drops in the price of OvaScience stock.  After this news was

#

revealed, the Company's share price dropped $5.47, from $35.06 on April 2, 2015, to close at

$29.59 on April 7, 2015, a loss of approximately 15%, on unusually heavy volume.

**Partial Disclosures as the Truth Emerges**

59.     On July 6, 2015, the Company published on its webpage a blog entitled "Women

Receiving AUGMENT Treatment had Improved Pregnancy Rates and Healthy Births."  The blog

post stated:

> **07/06/15 | MICHELLE DIPP, M.D., PH.D.**
>
> The European Society of Human Reproduction and Embryology (ESHRE) conference is where new fertility innovations and treatments take center stage and collaboration within the fertility community is fostered. During this year's ESHRE in Lisbon, Portugal, OvaScience hosted the scientific symposium, "Experts in Egg Health: Advancing Fertility Patient Care."  We were fortunate to have fertility specialists from more than forty countries in attendance -- all united by the goal of bringing new fertility treatment options to patients.  The scientific session featured leading physicians, some of whom have experience using the AUGMENTSM fertility treatment in their clinics.  The AUGMENT treatment is not available in the United States.
>
> In addition to presentations on the importance of egg health and its important role in fertility, the scientific session also included the patient experiences of women who have used the AUGMENT treatment.
>
> Of note, Michael Fakih, M.D., Founder and Chairman of Fakih IVF in the United Arab Emirates, reported his patients' experiences for the first time.
>
> - He showed positive results from 59 women with poor egg health and embryo quality who were given the AUGMENT treatment during IVF.
>
> - Before using the AUGMENT treatment, these women had a combined four percent clinical pregnancy rate and a two percent live birth rate based on a combined total of 257 previous IVF cycles.
>
> - With the AUGMENT treatment, the women's clinical pregnancy rates increased at least five-fold.

22#

#

Additionally, Kutluk Oktay, M.D., F.A.C.O.G, of Gen-Art IVF in Ankara, Turkey, shared the exciting news of the second birth by a woman who received the AUGMENT treatment. The healthy baby girl was born to a mother in Turkey who had failed seven previous IVF cycles and had never before had a successful pregnancy.

Robert F. Casper, M.D., F.R.C.S.(C), Medical Director of TCART Fertility Partners in Toronto, Ontario, also presented his patient experiences, as were previously reported during the 21st COGI Congress: Innovation in Reproductive Medicine, including the first birth with the AUGMENT treatment.

60.      On August 27, 2015, Mr. David Harding resigned as Chief Commercial Officer of the Company, effective August 28, 2015.

61.      Then, on September 28, 2015, the Company issued a press release entitled "OvaScience Provides Update on Corporate Goal for AUGMENT Treatment" announcing "the Company does not expect to meet the 2015 goal of 1,000 AUGMENT treatment cycles."

62.      Previously, the Company issued guidance to investors to expect 1,000 AUGMENT treatment cycles by year-end 2015.   OvaScience blamed the shortfall on marketing and acquisitions activity within clinics offering AUGMENT stating: "We recently became aware of M&A activities in our key clinics.  We believe these factors will prevent us from achieving our goal as we had anticipated the majority of AUGMENT treatment cycles would initiate in the fourth quarter."

63.      On this news, the Company's shares fell from $14.52 on September 28, 2015 to close at $8.57 on September 29, a drop of over 40%, on unusually heavy volume.

64.      Upon information and belief, on March 16, 2015, when the Company announced that it "planned" to have 1,000 AUGMENT treatment cycles in progress by the end of 2015, it knew that the number was false and misleading and knew the Company was unable to achieve its stated goal of having 1,000 AUGMENT treatment cycles in progress by the end of 2015.

65.     On March 31, 2016, Arthur Tzianabos, Ph.D., stepped down as the President and Chief Scientific Officer of OvaScience.  Dr. Tzianabos and the Company entered into a consulting agreement which provides for Dr. Tzianabos to act as an advisor to the Company through December 31, 2016.

66.     On July 1, 2016, Defendant Dipp resigned as Company CEO.

67.     Running low on money and even lower on credibility, on December 21, 2016, OvaScience announced that it would continue to make the AUGMENT treatment available to patients at partner clinics in Canada and Japan and maintain its current commercial footprint, but would slow its commercial expansion, reassess its ongoing and planned clinical studies of AUGMENT, and undertake a corporate restructuring, including a workforce reduction to better align its workforce to its revised corporate strategy and to carefully manage the Company's cash burn.

68.     On December 21, 2016, Harald Stock resigned from his positions as President and CEO and director and Paul Chapman resigned from his position as Chief Operating Officer.

69.     As of December 31, 2016, the Company reported having only 118 employees left and announced a further corporate restructuring that would take place in January 2017, in which the Company would be reducing its workforce even more so by approximately 30%.

70.     By December 2016, the Company's stock traded, and continues to trade, at under $2.00 per share, down from a Relevant Period high of $53.46 per share.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

71.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

#

72.     Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

73.     Plaintiffs are current owners of OvaScience stock and have continuously been an owner of the stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein.  Plaintiffs understand their obligation to hold stock throughout the duration of this action and are prepared to do so.

74.     During wrongful course of conduct at the Company, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

75.     The Board is currently comprised of seven (7) members: Dipp, Aldrich, Capello, Fisher, Kozin, Sexton, and Howe.  Thus, Plaintiffs are required to show that a majority of the Director Defendants, *i.e.*, four (4) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

76.     Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

77.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

#

78.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

79.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

80.     Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

81.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

82.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

#

**Defendant Dipp**

83.     Defendant Dipp is not disinterested or independent, which is admitted by the Company in its 2017 Proxy, and therefore, is incapable of considering any demand.  Defendant Dipp is the Executive Chair of the Company, and derives substantially all of her income from her employment with the Company, making her not independent.  As such, Defendant Dipp cannot independently consider any demand to sue herself for breaching her fiduciary duties to the Company, because that would expose her to liability and threaten her livelihood.

84.     Additionally, Dipp and Aldrich are partners at Longwood Fund, LP. Longwood Fund GP, LLC, an affiliate of Longwood Fund, LP, is an approximately 7% holder of OvaScience.

85.     Based on the forgoing and on the other facts alleged herein, Dipp cannot be considered independent or disinterested, and any demand on her would be futile.

**Defendant Aldrich**

86.     Defendant Aldrich and Dipp are partners at Longwood Fund, LP. Longwood Fund GP, LLC, an affiliate of Longwood Fund, LP, is an approximately 7% holder of OvaScience.

87.     As a Director of OvaScience, Aldrich was required to comply with its Code of Business Conduct, which includes that he comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein.

88.     Additionally, as a member of the Nominating and Corporate Governance Committee, Aldrich was required to develop, recommend, and reassess corporate governance guidelines, and oversee an annual self-evaluation of the Board. Aldrich failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

89.     Based on the forgoing and on the other facts alleged herein, Aldrich cannot be

#

considered independent or disinterested, and any demand on him would be futile.

**Defendant Capello**

90.     As a Director of OvaScience, Capello was required to comply with its Code of Business Conduct, which includes that he comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein.

91.     As a member of the Company's Audit Committee, Capello was responsible to monitor internal control over financial reporting, disclosure controls and procedures and code of business conduct and ethics, and oversee risk assessment and risk management policies.  Capello failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

92.     Based on the forgoing and on the other facts alleged herein, Capello cannot be considered independent or disinterested, and any demand on him would be futile.

**Defendant Fisher**

93.     As a Director of OvaScience, Fisher was required to comply with its Code of Business Conduct, which includes that she comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein.

94.     As a member of the Company's Compensation Committee, Fisher was responsible to oversee evaluation of the Company's senior executives.   Fisher failed to meet these responsibilities as evidenced by the executive turnover and corporate misconduct as alleged herein.

95.     Based on the forgoing and on the other facts alleged herein, Fisher cannot be considered independent or disinterested, and any demand on her would be futile.

**Defendant Kozin**

#

96. As a Director of OvaScience, Kozin was required to comply with its Code of Business Conduct, which includes that he comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein.

97. Additionally, as a member of the Nominating and Corporate Governance Committee, Kozin was required to develop, recommend, and reassess corporate governance guidelines, and oversee an annual self-evaluation of the Board. Kozin failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

98. Based on the forgoing and on the other facts alleged herein, Kozin cannot be considered independent or disinterested, and any demand on him would be futile.

**Defendant Sexton**

99. As a Director of OvaScience, Sexton was required to comply with its Code of Business Conduct, which includes that he comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein. Sexton failed to meet his responsibilities as evidenced by the corporate misconduct as alleged herein.

100. Based on the forgoing and on the other facts alleged herein, Sexton cannot be considered independent or disinterested, and any demand on him would be futile.

**Defendant Howe**

101. As a Director of OvaScience, Howe was required to comply with its Code of Business Conduct, which includes that he comply with all laws, rules and regulations applicable to the Company wherever it does business, and further comply with its mandate of honest and ethical conduct and fair dealing as stated herein.

#

102.     As a member of the Company's Compensation Committee, Howe was responsible to oversee evaluation of the Company's senior executives.   Howe failed to meet these responsibilities as evidenced by the executive turnover and corporate misconduct as alleged herein.

103.     Based on the forgoing and on the other facts alleged herein, Howe cannot be considered independent or disinterested, and any demand on him would be futile.

## FIRST CAUSE OF ACTION

## Against Defendants for Breach of Fiduciary Duties

104.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

105.     Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

106.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

107.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  In breach of their fiduciary duties owed to the Company, Defendants made false and/or misleading statements and/or failed to disclose that: (a) the science behind AUGMENT had not been scientifically validated; (b) the Company was unable to achieve the purported success rates it claimed; (c) the reasons why the Company moved its studies outside of the United States; (d) that at all relevant times, the Company's profitability and prospects were false and misleading; and (e) resultantly, the Company lacked adequate internal controls over its publicly issued statements and financial reporting, rendering them personally liable to the Company for breaching their fiduciary duties.

#

108.    Defendants had actual or constructive knowledge of the weaknesses of the Company's internal controls.  Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

109.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

110.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against the Director Defendants for Unjust Enrichment)

111.    Plaintiffs incorporate by reference and re-allege each and every allegation above as though fully set forth herein.

112.    By their wrongful acts and omissions, as alleged herein, the Non-Employee Director Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

113.    Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants, and each of them, and seek an order from this Court requiring the Defendants to disgorge all profits, benefits, and other compensation obtained by these Defendants, and each of

#

them, from their wrongful conduct and fiduciary breaches.

114.    Plaintiffs, on the Company's behalf, have no adequate remedy at law.

### THIRD CAUSE OF ACTION

#### (Against the Director Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934)

115.    Plaintiffs incorporate by reference and re-allege each and every allegation above as though fully set forth herein.

116.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

117.    Here, the Company's Proxy Statements for 2015, 2016, and 2017 violated Section 14(a) and Rule 14a-9 by omitting material facts.  The Proxy Statement omitted "the valuation metric used for SEC disclosure purposes ('Black-Scholes') is not an appropriate metric for assessing the adequacy and fairness of compensation awards to non-employee directors of biotechnology corporations.  […]  Given the extreme volatility of biotechnology corporations in general, and OvaScience in particular in 2014-2015, a Black-Scholes analysis produces 'valuations' that bear little or no relationship to the actual fairness and adequacy of the compensation awarded."

118.    In breach of their fiduciary duties, the non-employee Director Defendants granted, and continue to grant, themselves excessive compensation.  Over the past three (3) years (December 31, 2014 through December 31, 2016), the non-employee Director Defendants received, per annum, approximately $198,537 in compensation each.  For the year ended

#

December 31, 2015 alone, the non-employee Director Defendants received, on average, approximately $362,434 in compensation each.

119.    The Company's average annual total director compensation over the past three (3) reported years greatly exceeds the median total director compensation of $113,665 for the years 2014-2016 for companies with a market capitalization of between $50 million and $500 million. As such, the non-employee Director Defendants' compensation is unwarranted and grossly excessive in comparison to other companies of similar size.

120.    The omission of this material information rendered the Company's Proxy Statements for 2015, 2016, and 2017 false and misleading.  Because the Company's Proxy Statements for 2015, 2016, and 2017 solicited shareholder votes for director nominations, the Proxy Statements failed to disclose that the Company's method for valuing the options awarded to non-employee directors was inappropriate.

121.    As a consequence of the foregoing, the Company was damaged as a result of Defendants' material misrepresentations and omissions.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance

#

obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Requiring the Company to issue a corrective disclosure to shareholders; disclosing that the Company relied upon an inappropriate option value calculation method in its 2015, 2016, and 2017 SEC public filings;

E.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED: July 26, 2017

**SMOOT LAW OFFICE, P.C.**

By: *s/ Steven F. Smoot*
Steven F. Smoot (MA BBO #543799)
P.O. Box 120-245
Boston, MA 02112-0245
Telephone: (617) 345-9600
Facsimile: (617) 507-8383
Email: smoot@smootlaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*

34#

#